IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
(WESTERN DIVISION)

| | | |
|---|---|---|
| FREDDIE JONES, LUKE JONES, TRENNA JONES, RALPH JONES, LAVON JONES and JIMMY FREEMAN, as Surviving Children of ELNORA JONES, Deceased, Plaintiffs, | § § § § § § § | |
| v. | § § | CASE NO. 2:07-cv-02120-BBD-tmp |
| ABBOTT LABORATORIES, Defendant. | § § § | |

### PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S ORDER

In accordance with Rule 72(a), FED. R. CIV. P., Plaintiffs file the following objections to Magistrate Judge Pham's Order of November 10, 2011 (Doc.179) [hereinafter "Order"] concerning the production of Abbott's prescription drug, adverse event database in its native, electronic, computer searchable format. Production in this format is essential to put the plaintiffs on reasonably equal footing with Abbott and to permit them to utilize the power of computers to mine this voluminous database for relevant evidence, including, *inter alia*, the "proportional rate" of various reported side effects. In support of same, they would respectfully show the Court the following:

  1. <u>Proportional Reporting Rate Analysis is Relevant and Admissible</u>.  This case concerns adverse side effects stemming from the use of Abbott's prescription drug Humira.  The issue currently before the Court is production of an electronic copy of Humira's postmarketing, adverse event database.[1]  Otherwise known as "AEGIS."  Order at 2-3.

---

[1] "Postmarketing" surveillance and/or pharmacovigilence refer to the practice of monitoring the safety of a prescription medication after it has been released onto the healthcare market.  Adverse event reports made to a manufacturer and/or the FDA are a primary means of fulfilling this legislative requirement.

On November 10, 2011, after extensive briefing from the parties, multiple days of argument, and an examination of Plaintiffs' database consultant, the Magistrate Judge denied Plaintiffs' Motion to Compel a native, or electronic copy, of AEGIS (Doc.179). The findings of the Magistrate were based, in part, on the fact that he did not appear to believe that Proportional Reporting Rate ("PRR") analysis[2] is potentially admissible evidence or otherwise relevant to a case concerning prescription drug side effects. FED. R. CIV. P. 26(b)(1). In so doing, he highlighted the opinions concerning PRR in *In re Meridia Products Liab. Litig.*, 328 F. Supp. 2d 791 (N.D. Ohio 2004) and *In re Baycol Products Litig.*, 532 F. Supp. 2d 1029 (D. Minn. 2007). Order at 7-10.

However, in citing snippets from these opinions out of context, the Magistrate Judge ignored the courts' relevant holdings and the facts and circumstances that distinguish those cases from the case at bar. In *In re Meridia Products Liab. Litig.*, 328 F. Supp. 2d 791, 807-808 (N.D. Ohio 2004), the PRR analysis was offered as an effort to avoid summary judgment. It was submitted in a stand alone manner in the hopes of creating an issue of material fact with respect to general causation. *Id*. The *Meridia* court found this unavailing. Here, Plaintiffs intend no such thing. Rather, as made clear during oral arguments, PRR is but one relevant piece of the general causation puzzle. Exhibit A at 23-24 (Transcript of June 23, 2011 Hearing before Judge Pham). To that end, Plaintiffs intend to utilize PRR as part of the bigger scientific, general causation analysis. *Id*. Not as the entire thrust of it. *Id*. Plaintiffs' PRR consultant reiterated this point to the Magistrate Judge. *Id.* at 73-74.

The Magistrate Judge next discussed the exclusion of an expert's opinions based, in part, on PRR data in *In re Baycol Products Litig., supra.* Although it is certainly true that the court therein did exclude the plaintiff's expert, it did so based on a failure of the underlying peer-reviewed

---

[2] PRR can be defined as the statistical identification of abnormal or unusual reporting patterns of adverse events that could indicate increased drug risk. AEGIS is needed in its native format in order to conduct a comprehensive PRR of Abbott's Humira adverse event safety data.

literature with respect to the statin class of drugs and the expert's use of *inter*-statin comparative analysis. *Id*. at 1041-42.  It did not find PRR in-and-of-itself to be unreliable, but rather, it found the underlying peer-reviewed literature cited by the plaintiffs' experts to be unsupportive of the specific proposition that Baycol is the most toxic statin.  *Id*. at 1041.  Importantly, however, the court specifically held PRR data *to be admissible*:

> Although this Court holds that Dr. Farquhar's expert opinion that Baycol is more toxic or dangerous than others statins must be excluded under Rule 702, such holding is not meant to prevent the admission of [Adverse Event Reporting] evidence at trial.  As Plaintiffs point out, the [Adverse Event Reporting] data relevant to this case presented a very strong signal concerning Baycol and its association with rhabdomyolysis, and such evidence may be relevant at trial.  It thus follows that Plaintiffs' experts may testify as to the existence of this signal.

*Id.* at 1042-43.  Thus, the exclusion was a failure of the underlying science of statins not a failure of the merits of PRR.

To that end, and although it is perhaps a bit premature to engage in a discussion of PRR and its scientific reliability, Plaintiffs have attached a small sampling of peer-reviewed articles recognizing the merits and usefulness of PRR in the context of prescription drug safety for the Court's examination.  Exhibits B, C and D.  PRR is undeniably a well accepted premise of pharmacovigilence and "good science."

Plaintiffs are not lone voices crying out in the wilderness with respect to PRR, adverse event reporting, and general causation. Other courts have specifically found this scientific tool to be useful in the *Daubert* reliability analysis.  *E.g., In re Fosamax Prods. Liab. Litig.*, 645 F.Supp.2d 164, 184-85 (S.D.N.Y. 2009)("The Court finds that the relatively high number of recent ONJ reports, almost exclusively involving bisphosphonate use, confirms the clinical experience of the PSC's oral maxillofacial experts, and adds to the reliability of their opinions"), *In re Phenylpropanolamine*

*(PPA) Products Liab. Litig.*, 289 F. Supp. 2d 1230, 1242-43 (W.D. Wash. 2003)("In considering the non-epidemiological evidence relied upon by plaintiffs' experts, the court finds significant the sheer volume of case reports, case series, and spontaneous reports associating PPA with hemorrhagic stroke in women."). *See* Plaintiff's Notice of Supplemental Authority (Doc. 159).[3] Should the Court require further proof, even Abbott itself, once it steps away from its litigation position and back into the realm of the real world of drug safety, acknowledges the usefulness, appropriateness, and acceptance of PRR. *See* section 2, *infra*.

One final important point that needs to be addressed in this section is FN 6 of the Order. Therein, the Magistrate Judge specifies that Plaintiffs must compare the reporting ratios of Humira to other drugs in order to complete their PRR analysis. As such, Plaintiffs should seemingly be able to obtain the necessary information from the FDA. Although this statement does imply some deference to the courts that have admitted PRR and is in some ways contrary to *Baycol*, with great respect for the Magistrate Judge, it misses the mark. While a PRR analysis of Humira in relation to its competitors is certainly an important consideration, *more important*, and completely unlike *Baycol*, is the proportionality data across the Humira database itself. In other words, and with specific regard to this case, the particularized need for this data is to examine the numbers of reported cases of lymphomas and malignancies being reported directly to Abbott *and* analysis of those adverse events as *directly compared* to other adverse events within Abbott's Humira database.

It is this *intra*-AEGIS PRR analysis that can reveal a "signal" within Abbott's own data and that contributes both to the general causation argument and to Abbott's concomitant duty to warn.

---

[3] At the conclusion of oral arguments, the Magistrate Judge directed each party to submit any supplemental authority it desired the court to consider. It expressly directed the parties to submit case cites only and to refrain from any associated argument. The Magistrate Judge's Order did not reference or otherwise discuss these cases.

*See* footnote 7, *infra*. Plaintiffs have no means of undertaking a comprehensive PRR analysis without an electronic copy of the database.[4]

Moreover, it is equally important that Plaintiffs examine the various *types* of malignancies being reported, how they compare to each other in terms of reported rates, as well as how they compare to other reported adverse events *within* the database. An electronic copy of the database is the only way for Plaintiffs to determine how the reported events stood in relation to other reported events and if such proportionality should have triggered a response from Abbott.[5]

Without the entire AEGIS database, Plaintiffs are simply unable to give any perspective to the adverse events reported to, or produced by, Abbott.[6] Although the Magistrate Judge did cite the above language from *Baycol*, he never explained how or why the AEGIS data, and subsequent PRR analysis, would be irrelevant with respect to this case. Neither did he explain, in light of other cases submitted for consideration, how or why Plaintiffs *intra*-Humira analysis is irrelevant or inadmissible. It is unfair to allow Abbott to readily query, access, tabulate, and analyze information

---

[4] Plaintiffs' consultant, Keith Altman, section 2, *infra*, also explained to the Court why the FDA available data is not a complete data set, and that even should Plaintiffs gather the information from the FDA as the Magistrate Judge states, they would still not have an accurate picture of all the adverse event data possessed by Abbott. Exhibit A at 68-69.

[5] It is worth noting that the parties have agreed to postpone the deposition of Abbott's Rule 30(b)(6) pharmacovigilence expert, Dr. James Embrascia, and Plaintiffs' expert reports until such time as this database issue is resolved. As the proffered expert on Humira adverse event reporting and related analysis, clearly this issue is germane to his deposition and Plaintiffs' report.

[6] Although it does appear to be true that Abbott has produced the lymphoma and malignancy related adverse events in pdf format to Plaintiffs, as Mr. Altman makes clear, without the entirety of the database, there is simply no means to give these numbers any perspective or context. Thereby, their utility is greatly diminished.

from this electronic database and preclude Plaintiffs from having the same opportunity.[7] Without a copy of the entire database, Plaintiffs cannot fight this battle on an even playing field.

  2. <u>Production of the AEGIS Database is Relevant and Admissible Towards the Issue of Notice</u>. Plaintiffs have already touched on this argument and will not squander the Court's time by being repetitive. Suffice it to say that the Magistrate Judge's Order either misinterprets or misunderstands Plaintiffs' arguments with respect to notice. Although Plaintiffs vigorously dispute any notion that PRR analysis is unscientific or otherwise unhelpful in the general causation context, even if it was, such an idea has absolutely no bearing on the issue of notice.

As alluded to earlier, Abbott itself has acknowledged the usefulness and appropriateness of PRR analysis. The Court is free to take judicial notice of the comments published by Rashmi Hegde, Abbott's Director of Pharmacovigilence for Asia-Middle East-Australia-Canada, and found at http://www.pharmafocusasia.com/strategy/safety-reports.htm. Therein, Hegde discusses how "safety reports" play a "key role in the assessment of drug safety." And with specific regard to PRR, Hegde made the exact same point that Plaintiffs argued to the Magistrate Judge:

> Statistical ratios such as the proportional reporting rate are used to assess new, serious or increased [Adverse Drug Reaction] rates. The identified Safety signals are discussed and measures proposed –

---

[7] In fact, Abbott has already undertaken their own database query and PRR analysis in responding to Plaintiff's Motion to Compel and in an effort to head-off production of this database. *See* Abbott's Motion for Protective Order Quashing Plaintiffs' Request for Abbott's Adverse Event Reports Database at 5 (Doc. 150). The .3% and 3% figures attributed to lymphomas and malignancies, respectively, by Abbott in its Motion are PRR's of the AEGIS database. Abbott ran these calculations themselves. As argued to the Magistrate Judge, without an electronic copy of the database, Plaintiffs have no means to verify, compare, or otherwise put these figures in context. Exhibit E at 17-24 (Transcript of June 13, 2011 Hearing before Judge Pham). Nor are they able to see what information Abbott readily had available to it in this context. The Magistrate Judge was also offered evidence that Abbott runs these same types of analyses as a matter of their ordinary course of business. Exhibit F-FILED UNDER SEAL (Email dated 7/28/05).

>       heightened surveillance, change to the reference safety information,
>       routine monitoring, or no action.

Plaintiffs' consultant, Keith Altman, is an expert in adverse event databases and PRR analyses, and someone intimately familiar with AEGIS and the production thereof. He was tendered for examination by the Magistrate Judge on this issue. Exhibit A is the transcript from the Magistrate Judge's examination of Mr. Altman. Understanding that the Court can read the short transcript, Mr. Altman reiterated the use of PRR in the general causation context, its utility with respect to assessing adverse events, and the mechanics of actual database production. *Id*. at 15-52. He specifically highlighted that the main reason for getting the "entire Humira database is to put the specific adverse events of this case in context with all the other adverse events" and the issue of notice. *Id*. at 18-19, 27-28, 74.

Curiously, in his Order, the Magistrate Judge quotes from the FDA itself with respect to safety signals, from whence they originate (*i.e.,* postmarketing reports), and the importance thereof, but then never articulates how or why such notice is unimportant in the case at bar. Order at FN3. He did not do so even though he heard extensive corroborative testimony from Mr. Altman about these signals in the real world. Nor did he explain how putting the specific adverse events into context is neither relevant nor admissible.

Admittedly, the FDA did articulate that increased safety signals "do not establish enforceable responsibilities" in-and-of-themselves and the Magistrate Judge so noted. Order at 9-10. However, such "signals" absolutely *do* bear on whether Abbott acted with prudence and as would be expected of a reasonable drug manufacturer in the face of such signals. The jury will be asked to confront these very issues. Further, the Magistrate Judge never explained how or why such notice is not relevant to this case or the issues before this Court. Without the entire AEGIS database, Plaintiffs are left with a "hole" in the evidence that cannot be filled by other means. Abbott will unfairly

benefit from such a position because the jury will not have any evidence by which to gauge whether Abbott acted appropriately in the face of safety information it possessed and analyzed in the ordinary course of business.

  3. <u>The Magistrate was mistaken about the burden on Abbott:</u>  The Magistrate intimated that the number of reports at issue in this case was an additional consideration for denying Plaintiff's Motion to Compel.  Order at 11 and FN 7.  However, such a holding ignores the testimony of Abbott's very own database manager.  Abbott has previously been required to produce a copy of its AEGIS database.[8]  *Id*. at 10-11.  And it is equally true that such production took approximately 10 weeks.  However, left unsaid in the Order is that the vast majority of that time was spent negotiating the terms of the actual production, not in the production or translation of the data itself.  Exhibit A at 103-104.  The actual production itself was only a "two-to three-week exercise."  *Id*.  In fact, per Abbott's own database manager, the *size* of the database is irrelevant to the burden, because it is all done electronically.  *Id*.  In other words, the size of the database "won't substantially change" the amount of time it takes to extract the data.  *Id*.  Thus, the relative number of adverse event reports is irrelevant to the burden.[9]

  The database managed was additionally asked whether the "scripts" that would be needed to electronically extract the relevant data from AEGIS for production still existed from the Depakote litigation.  *Id.*  Although he could not say one way or the other whether the scripts still exist, IF they still do, and there is at least some reasonable reason to expect the scripts to still exist,[10] whatever

---

[8] *Rix, et. al., v. Sanchez, et al*, Case No.:CV-2005-1219-S, March 2, 2010 (Ala. Cir. Ct.).  The drug at issue was Depakote.

[9] The Magistrate Judge acknowledged this very fact himself during oral arguments.  *Id*. at 107-108.

[10] Frankly, it would be illogical for a company to be forced by court order to undertake such an "exercise" and then delete the means by which they fulfilled their required

burden would be presented by requiring production of an electronic copy of the database would be reduced even further.  It would equally reduce the time involved.  For a company that makes $6 billion a year on this medication, a "two-to three-week exercise" is not unreasonable.

      To conclude, production of the AEGIS database is relevant to the issues before this Court, calculated to lead to admissible evidence, and  not overly burdensome.  This Court should so hold and order Abbott to produce a native format, electronic copy of the AEGIS database with respect to Humira.

Respectfully submitted,

PERDUE KIDD & VICKERY

*/s/ Arnold Anderson (Andy) Vickery*
Arnold Anderson (Andy) Vickery
Texas Bar No. 20571800
Fred H. Shepherd
Texas Bar No. 24033056
510 Bering, Suite 550
Houston, TX  77057-1469
Telephone:  713-526-1100
Facsimile:  713-523-5939
Email: andy@justiceseekers.com
Email: fred@justiceseekers.com
*Counsel for Plaintiff*

Edmund J. Schmidt III
Tennessee Bar No. 21313
Law Office of Eddie Schmidt
1720 West End Ave., Suite 300
Nashville, TN  37203
Telephone:  615-425-7121
Facsimile:  615-425-7110
Email: eddie@eschmidtlaw.com
*Co-Counsel for Plaintiff*

---

responsibilities.

<u>Certificate of Service</u>

I certify that on this 23rd day of November, 2011, Plaintiffs' Objections to Magistrate Judge's Order has been electronically filed with the Clerk using the CM/ECF system, which will automatically send email notifications of such filing to the following attorneys of record:

> John W. Donley, Esq.
> Michael Foradas, Esq.
> Andrew P. Bautista, Esq.
> Renee D. Smith, Esq.
> KIRKLAND & ELLIS, LLP
> 300 North LaSalle Street
> Chicago IL  60654
>
> Jill M. Steinberg, Esq.
> Robert F. Tom, Esq.
> Emily Turner Landry, Esq.
> Kristine L. Roberts, Esq.
> BAKER DONELSON BEARMAN
>  CALDWELL & BERKOWITZ
> 165 Madison Ave., Suite 2000
> Memphis, TN  38103

*/s/ Arnold Anderson (Andy) Vickery*
Arnold Anderson (Andy) Vickery
