1

1       IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF TENNESSEE
2              WESTERN DIVISION

3

FREDDIE JONES, LUKE JONES,
4   TRENNA JONES, RALPH JONES, LAVON
    JONES and JIMMY FREEMAN, as
5   Surviving Children of ELNORA JONES,
    Deceased,
6
      Plaintiffs,
7
    Vs.                Case No.2:07-cv-02120-BBD-tmp
8
    ABBOTT LABORATORIES,
9
      Defendant.
10

11

12

      THE DEPOSITION OF R. FRANKLIN ADAMS, MD
13              August 24, 2011

14             VIDEO DEPOSITION

15

16

17

18

19

20

                  Madelyn E. Gray
21                Court Reporter
            Suite 303, 22 N. Second Street
22            Memphis, Tennessee 38103
                 (901) 527-1100
23

24


RIVERSIDE REPORTING SERVICE

1   thing.

2   Q.   Do you have any subspecialties within the

3   field of rheumatology that you focus on or you

4   generally treat?

5   A.   Well, it's all clinical.  I don't do

6   research or scientific type investigations.

7   Q.   But you don't focus on any particular one

8   of these rheumatology diseases you treat?

9   A.   No.  It just works out that rheumatoid is

10  probably the most time consuming.  Certainly,

11  that's the bulk of the difficult cases that we

12  see.

13  Q.   From what medical school did you

14  graduate?

15  A.   University of Tennessee here in Memphis.

16  Q.   And what year did you graduate?

17  A.   1963.

18  Q.   And after you graduated from medical

19  school, did you complete any internships?

20  A.   I went to the Graduate Hospital at

21  University of Pennsylvania for a year of

22  general internship there.

23  Q.   And in what field of medicine did you do

24  that internship?

1   increasing vertebral body fractures.  And we,

2   she had an innate intolerance to the usual

3   disease modifying agents.  So this was a new

4   option to consider, and we gave it strong

5   consideration.

6   Q.   Does this note mean that you had started

7   discussing the option of Remicade with

8   Ms. Jones?

9          MR. PERDUE:  Object to the form.

10  Q.   (BY MR. BAUTISTA:)  You can go ahead and

11  answer the question.  He just stated an

12  objection for the record.

13  A.   Oh, that's what he was doing?

14  Q.   Yeah.

15  A.   I couldn't -- yes.

16  Q.   And generally, in this time period, could

17  you tell me how you would explain the TNF

18  inhibitor option to patients like Ms. Jones?

19  A.   I would just translate the previous

20  paragraph that you verbalized, trying to make

21  it simple but informative.  And it would be an

22  option that we should consider, and give her a

23  rundown on the risks and the benefits, and

24  potential toxic reactions, and to weigh it,

108

```
 1    and we'll think about it and talk about it.  I

 2    was in favor of giving it a trial, personally.

 3    But it was her decision to, to make.  It

 4    always is.

 5    Q.   Right.  Let's see.  If we could move

 6    forward to Adams Page 83, which is now in the

 7    end of 2000, in December of 2000.  There's a

 8    report from you dated December 29th, 2000.  I

 9    believe it says increased something,

10    arthritis?

11    A.   Polyarthritis.  It's inflammation of the

12    joints.

13    Q.   So at this point in December of 2000,

14    she, her rheumatoid arthritis is progressing

15    even worse?

16    A.   Correct.

17    Q.   And so you make a note that she, you

18    really need to, really must -- well, I'm not

19    exactly sure what that sentence is.  It says

20    something, really something, TNF prescription?

21    A.   Really needs TNF treatment.  That's my,

22    that was my judgment call.

23    Q.   So as we were discussing earlier, for all

24    the reasons of her advanced disease state, and
```

155

```
 1    is 2004?

 2    Q.    Yes.

 3    A.    The drug had only been out a year.  There

 4    wasn't a whole lot of story line about that

 5    drug at that time in terms of -- any of the

 6    TNF's was a kind of a whisper in the

 7    background about the risks of lymphomas.  And

 8    it wasn't absolutely clear at that point where

 9    we stood.  It still doesn't, for that matter,

10    in my mind.  But in general, yeah, I went over

11    everything with her the best I could, and you

12    know, always presented a fair minded picture

13    where I thought we should go.  I still think

14    it was the logical thing to do, that which we

15    chose to do, and why we did it.

16    Q.    So after balancing the benefits against

17    the risks, you reached in your independent

18    clinical medical judgment to prescribe Humira

19    to Ms. Jones in late 2004?

20    A.    I did.

21    Q.    And so in your decision to prescribe

22    Humira, it was your clinical judgment that the

23    likely benefits of Humira outweighed the

24    potential risks or side effects from the drug?
```

1    rheumatoid arthritis?

2    A.    Yes.

3              MR. PERDUE:   I object to the form.

4    A.    I think I heard you right.

5    Q.    Today you continue to when you are

6    prescribing, decision making to consider the

7    studies where they are attempting to --

8    attempting to determine whether there is an

9    increased risk of lymphoma in rheumatoid

10   arthritis patients on biologics compared to

11   rheumatoid arthritis patients who are not on

12   biologics?

13   A.    I think that is fair.  I would say that

14   the dialogue has become more dispersed in the

15   arthritis rheumatoid family, if you will, so

16   it doesn't come as a shock out of the bolt,

17   out of the blue when you bring that up.  But I

18   still present it as an unknown fact and yes,

19   I'm sorry, sir, but that there is a risk of

20   lymphoma with your disease.  And whether it is

21   exaggerated with the drug we haven't yet

22   proven yet.  And but it is I do -- I speak in

23   that term more and more with each patient at

24   this stage of the game.

182

 1    This statement I think is apropos.  I don't

 2    have any problem with the while patients with

 3    RA may have higher risks for the development

 4    of lymphoma, and the role is not known.  That

 5    label is -- I mean, I agree with that

 6    entirely.

 7    Q.    So you would agree that warning about

 8    lymphoma that you just read in the December

 9    2002 label was consistent?

10    A.    If you call that a warning.  It is more

11    of a declaration of uncertainty it sounds to

12    me like.

13    Q.    Let me rephrase.  You would agree that

14    the language in the product label for Humira

15    in December of 2002 concerning lymphomas is

16    consistent with your understanding of the

17    knowledge, the state of the art knowledge

18    about the risk of lymphoma from TNF inhibitors

19    at that time period?

20            MR. PERDUE:  Object to the form.

21    A.    I accept that.  Yes.

22    Q.    (BY MR. BAUTISTA:)  Looking at what has

23    just been given to you marked as Exhibit 4.

24    So I think you had explained to us during a

1    A.    I'm glad you did.  I would think if

2    Abbott really wanted me to do that, that they

3    would come and sit me down and give me who,

4    what, why, when, where about it precisely.

5    Abbott may have a different perspective than I

6    think the patient has.  Abbott may be

7    protecting their own skin, and in the process

8    they don't care if three people get scared

9    off, they are going to, you know, they may

10   come out that they have got so many patients

11   dying for it that they don't care.  But the

12   three they lost may be the three that should

13   have gotten it in the first place.  It is very

14   philosophical.  It is not black or white, and

15   I'm sympathetic to every question you are

16   asking me, and I wish it was a perfect world

17   and I wish I was a perfect physician.

18   Q.    Do you have any recollection of any

19   Abbott sales representatives ever --

20   A.    I don't.  I don't.  We talk all the time.

21   They are there, you know, every two weeks.  We

22   have all sorts of discussions.

23   Q.    Do you recall somebody by the name of

24   Kirkland LaLance?  Does that name ring a bell

243

1     conversation regarding a prescription; fair?

2     Is that true?

3     A.    I say yes.  Okay.

4     Q.    I am wondering if you ever recall

5     presenting the actual written informed consent

6     form for the use of Humira to a patient

7     enrolled in the HERO Study?

8     A.    I don't know.  I tell you what, what

9     really happens is that all that happens before

10    I mean, beyond around me.  I have a team of

11    people that run all of these studies, and I

12    really, I am just the physician.  That type of

13    data for better for worse is not my forte and

14    I don't have time to do.  That is not the way

15    to answer it, but I really don't deal with the

16    persnickety details.

17    Q.    I take it by that, anything that is a

18    communication into your office related to a

19    clinical study on Humira in which Ms. Inman is

20    copied, she probably took it and was in charge

21    of it?

22    A.    You better believe it.  You are talking

23    to the wrong person here.

24    Q.    I get that impression.  For any financial

247

```
 1    but I don't remember exactly anything precise.

 2    I just don't know.  It has been a long time

 3    ago.

 4    Q.    Was Ms. Jones a patient who was compliant

 5    with your medical instructions?

 6    A.    I think so. It might have been a few

 7    times when she decided she wanted to do her

 8    things her way, which is, you know, she is a

 9    lovely lady.  I enjoyed her very much.  No

10    real conflict that was serious.  I saw those

11    notes in there we presented her with an option

12    of, what was the -- we discussed an option

13    with two pharmaceuticals, and she chose the

14    Amgen route.  And I can't remember whether

15    that is the one she chose.  We talked about

16    it, and it is in the record there.

17    Q.    Yeah, I was trying to figure out.  Do you

18    know what, the other word is Narvotis?

19    A.    The other is Narvotis, that's correct.

20    Yes.

21    Q.    What TNF blocker, to your knowledge, is

22    manufactured by Narvotis?

23    A.    I don't know.  I can't remember.

24    Q.    When you used the term lymphoma overlap
```

1    follow-up questions based on the questioning

2    that you have went through with Mr. Perdue, if

3    you are done.

4              MR. PERDUE:  I pass the witness.

5                  REDIRECT EXAMINATION

6    BY MR. BAUTISTA:

7    Q.   Do you recall questioning by Mr. Perdue

8    about the compensation you received for your

9    participation as a clinical investigator in

10   the HERO clinical studies sponsored by Abbott?

11   Do you recall that line of questioning?

12   A.   Yes.

13   Q.   Would it be fair to say that

14   participation, or compensation for

15   participation in clinical studies is not a

16   significant source of revenue for you?

17   A.   Yes.  Say that again, and let me think

18   through that now.

19   Q.   Could you go ahead, so it is said

20   correctly.

21             (Whereupon, the question was read

22   by the reporter.)

23   A.   I withdraw that.  No, I think it is

24   significant.

255

1    know, direct payments for, you know, putting

2    patients on Humira as opposed to some other

3    TNF inhibitor; is that correct?

4                MR. PERDUE:  Object to the form.

5    A.    Is that a contradiction?

6    Q.    Let me say it this way.  You didn't

7    receive payments from TNF inhibitor companies

8    to, you know, prescribe, you know, that

9    company's TNF inhibitor to a patient?

10                MR. PERDUE:  Object to the form.

11   A.    Are you not contradicting yourself when

12   you say that?

13   Q.    Okay.  Maybe I am stating it --

14   A.    Let me make one comment here.  I never --

15   this study, and I have never had a situation

16   quite like that in my whole career at this

17   quote unquote, HERO Study.  And I wasn't happy

18   with it, and I wasn't proud of it.  It just

19   was what they came up with and that was the

20   only way I could access patients into this

21   drug.  And most -- you asked about the -- I

22   would like to defend myself here.  Most drug

23   studies are not compensated on find a patient

24   and I will give you a check.  They are

1    compensated for doing a research project of a

2    double-blind placebo controlled nature that

3    are very valuable studies.  And they are

4    scientifically based and yeah, there is

5    compensation for it, but a hell of a lot of

6    work and it is very dedicated work.  This is a

7    little obtuse as far as I'm concerned.

8              I played ball with them simply to

9    get access to the drug for patients that were

10   in need.  These drugs are extremely valuable,

11   and yes, they have their potholes, but they

12   are extremely valuable to the masses for

13   treatment of rheumatoid arthritis, and many,

14   many people cannot afford them.  And I

15   guarantee Abbott no longer pays anybody for

16   patients on their pills.

17   Q.   Do you remember the line of questioning

18   about Abbott salespersons?

19   A.   I was thinking to myself.  Go ahead, I'm

20   sorry.  I lost my train of thought.

21   Q.   Do you recall the line of questioning

22   from Mr. Perdue about Abbott salespersons

23   having conversations with you about Humira?

24   A.   Yeah, I just was vague on it but, yeah.

1    So?  I'm sure they did if he found it in

2    there, but I don't recall.

3    Q.    But all the time --

4    A.    And I seek these guys out for information

5    all the time.  Don't get me wrong, I ask them

6    everything I can think to ask them.  And they

7    are usually great resources.  We have

8    excellent relationships with these people, the

9    detail people.

10   Q.    But you make your own independent

11   decision on what drug to prescribe a patient

12   notwithstanding what any company salesperson

13   says to you?

14   A.    Absolutely.  Of course.  Just like in

15   this case, I gave this lady two options, and

16   the only two I could think that she could

17   possibly afford, and I was going to have to

18   work to get those.  She chose the one we used.

19   It was her choice, not mine.

20   Q.    Then my final set of questions.  You

21   never made any assessment or determination

22   about the cause of Ms. Jones' lymphoma; is

23   that correct?

24   A.    I never was asked.  I say that and I

262

```
 1          COURT REPORTER'S CERTIFICATE

 2    STATE OF TENNESSEE:

 3    COUNTY OF SHELBY:

 4        I, MADELYN GRAY, Reporter and Notary

 5    Public, Shelby County, Tennessee, CERTIFY:

 6        1.   The foregoing deposition was taken

 7    before me at the time and place stated in the

 8    foregoing styled cause with the appearances as

 9    noted;

10        2.   Being a Court Reporter, I then reported

11    the deposition in Stenotype to the best of my

12    skill and ability, and the foregoing pages

13    contain a full, true and correct transcript of

14    my said Stenotype notes then and there taken;

15        3.   I am not in the employ of and am not

16    related to any of the parties or their

17    counsel, and I have no interest in the matter

18    involved.

19        WITNESS MY SIGNATURE, this, the _____ day of

20    _____, 2011.

21

22    _____

      MADELYN GRAY, Court Reporter,
23    Notary Public for the State of
      Tennessee at Large * * *
24
      My Commission Expires:  February 2012
```

RIVERSIDE REPORTING SERVICE